## TOBIN v. RAMEY.

Civ. A. No. 3167.

United States District Court
W. D. Louisiana, Monroe Division.

Aug. 6, 1952.

William S. Tyson, John J. Babe, Washington, D. C., Earl Street, T. Hagan Allin, Department of Labor, Dallas, Tex., for plaintiff.

Deutsch, Kerrigan & Stiles, New Orleans, La., for defendant.

DAWKINS, Chief Judge.

This is a proceeding in which the sole relief sought is an injunction against alleged violations of Sections 15(a) (2) and 15 (a) (5) of the Fair Labor Standards Act of 1938, enacted June 25, 1938, c. 676, 52 Stat. 1060, U.S.C.A. Tit. 29, § 201 et seq., by failing to keep proper records as therein provided. Defendant admitted that some of his employees had worked more than forty hours per week without having been paid one and one-half times their regular pay for overtime, but denied that the work which he was doing came within the purview of the Act. He further admitted that he did not keep such records as required by the Fair Labor Standards Statute for the reason that, in his opinion, it did not apply. As a second defense, respondent contends that the issue has become moot since the work has been completed and there is no

showing that he intends, or will in the near future do similar work in which the statute could be violated.

On September 21, 1949, defendant entered into a contract with the United States to do certain construction work on what was known as "White Oak Levee", a part of the levee system for the main channel of the Mississippi River on its West side in Tensas Parish, Louisiana. It involved the building of a new or set-back levee to replace the old at a distance ranging from two to six miles from that portion of the river known as "Yucatan Cut-Off". On January 5, 1951, the work was accepted as of 21 December 1950. On the 13th of that month, defendant was served with process in this case, charging that he "employed and is employing in interstate commerce * * * approximately 25 employees in and about his place of business * * * in the re-construction, maintenance, repair and im-provement of levees" on the Mississippi River "which are designed and intended to control, and will have the effect of control-ling the flood waters, water depth, channels, flow and navigability of such river, on and over which goods are regularly shipped and transported in interstate commerce, and which levees are further designed and in-tended to prevent, and will have the effect of preventing the flooding of farm lands and impairment of other existing facilities used or engaged in the production of goods for interstate commerce, within the meaning of the (Fair Labor Standards) Act".

## Opinion

There is little or no dispute as to the facts, and the issues are mainly (as stated in the brief for the plaintiff) these:

"(1) Whether defendant's employees engaged in the repair, enlargement and improvement of a segment of the main Mississippi River Levee System were engaged in activities bringing them within the purview of and entitling them to the benefits of the Fair Labor Standards Act of 1938, as amended, and

"(2) Whether or not, on the basis of all the facts and the evidence of rec-ord herein, plaintiff is entitled to an in-junction permanently enjoining and re-straining defendant from violating the provisions of Sections 15(a) (2) and 15(a) (5) of the Act in the future."

Defendant has on other occasions per-formed similar work for the Government and while not presently so engaged on the same kind of undertaking on the Mississippi River, he has, since the White Oak Levee was built, done other work under contract with the Board of Army Engineers, which was authorized under the Flood Control Act of May 15, 1928, 33 U.S.C.A. § 702a et seq.

As background, plaintiff calls attention to matters of which the court may take cog-nizance as factors which it asserts support the contention that those employed in con-structing levees on a navigable stream, es-pecially the Mississippi, are engaged in interstate commerce, or are so closely con-nected therewith as to form a part of it, and further which contribute to the pro-duction of goods for commerce as contem-plated by the Fair Labor Standards Act. It points out that White Oak Levee is a part of the main West Bank Levee System of the Mississippi, extending from Cape Girardeau, Missouri, to the head of the Passes, near the Gulf of Mexico; that in the valley protected by the levee built by defendant there are ten Louisiana parishes North of Red River, and fifteen South thereof similarly situated, which are thus protected from overflow; that paved high-ways and railroads, telephone and telegraph lines, as well as other instrumentalities of interstate commerce, are in this valley and so protected; that thousands of acres of rich farm lands therein produce cotton, sugar, rice and other products which are shipped in such commerce, as well as lum-ber and other wood products manufactured by sawmills, stave factories, etc.; that crude oil and gas are produced in at least six of said parishes, which are likewise conveyed to market in interstate commerce; and fur-ther, that in the same area, a substantial number of those engaged in the manufac-turing and production of goods for such commerce "regularly" order or receive goods in interstate commerce to be used in the production of other goods therein.

On the other hand, defendant emphasizes the fact that the contract under which the

work was done did not expressly make the Fair Labor Standards Act applicable thereto, and that the definition of "commerce" and "produced" (the latter as amended by the Act of 1949) in Subparagraphs (i) and (j) of Section 3 of the Fair Labor Standards Act of 1938, do not cover work such as was being done here. Subparagraph (j) of Section 3 of the Act of 1938 provided:

"(j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

The Amendment of 1949 changed this subsection to read as follows:

"(j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any *closely related* process or occupation *directly* essential to the production thereof, in any State."

This amendment was brought about by some rather wide applications by the Labor Department and courts of the word "produced", and admittedly had the effect of narrowing its meaning. Much time and space could be consumed in attempting to reconcile or distinguish the many pertinent decisions, legislative reports, etc., and but for the press of work on this Judge in this very hot summer, it would be a pleasure and profitable to him to do so. However, under the circumstances, it is sufficient to say that the work of constructing a major levee some three to six miles from the bank of the Mississippi, in my judgment, does not place anyone connected therein in a "trade, commerce, transportation, trans-

mission or communication among the several states or from any state to any place outside thereof". Persons engaged as is the defendant in this case, would certainly not be trading with anyone, engaging in commerce, transportation, transmission or communication among the several states, as would persons who might be operating a steam-boat, telegraph or telephone business across state lines. The nearest that any case has come in its circumstances to the present controversy, was that of Walling v. Patton-Tulley Transp. Co., 6 Cir., 134 F.2d 945, the circumstances of which were stated as follows:

"The appellee is a Tennessee corporation engaged in loading and transporting logs on the Mississippi River, and in the construction of dikes and revetments in both the Mississippi and Missouri Rivers, and in connection with its loading and transportation business maintains a fleet of boats and barges towed by tugs in interstate commerce. It likewise, under contract with the United States, has been engaged in the construction and repair of dikes and revetments on the Mississippi in the performance of which large quantities of material are shipped from several states to the scenes of operation. Both the Missouri and Mississippi Rivers carry a substantial volume of interstate traffic, and the purpose of the dike and revetment work is to direct and channelize the current of the river in order to prevent erosion and to maintain the minimum depth required by commercial navigation.

"The appellee stipulated, and the court found, that employees engaged in unloading out-state goods in Tennessee were subject to the provisions of the Fair Labor Standards Act; that in respect to them wages were paid at rates less than the minimum provided in the Act for the period involved; that the appellee had failed to make, keep and preserve records setting forth the information required to be recorded by regulations promulgated by the Administrator; and that the latter was entitled to the relief prayed. It entered

a degree for injunction in this respect, but at the same time denied to the Administrator any relief in respect to wages and hours of work of employees engaged in constructing and repairing dikes and revetments, on the ground that unlike the others, they were not engaged in commerce."

The lower court had applied the provisions of the Fair Labor Standards Act to the portion of the work consisting of the transporting of logs and other freight on the rivers there involved, as to which there was no dispute, "but * * . * denied * * * any relief in respect to wages and hours of work of employees engaged in constructing and repairing dikes and revetments, on the ground that unlike the others, they were not engaged in commerce". On appeal, Judge Simons, as the organ of the court, reviewed the jurisprudence at length and reversed the lower on the second phase of the case. This decision was handed down in 1943, some six years prior to the Amendment of 1949 and might still be good law for the reason that the employees were performing directly labor, the purpose of which was to deepen, improve and make more usuable for boats, rafts, etc., the river at the particular places where the work was done, and the situation there may readily be compared to laborers upon the roadbed and track of an interstate railroad, which is daily used in interstate commerce. However, the levee constructed in the instant case would have only a remote influence on the channel of navigation, and its main purpose was to prevent floods from overflow in order that the available lands thus might be protected for agriculture and other purposes, which otherwise would be seriously interfered with. In the Walling and similar cases, the work was so closely related to commerce as to be, for practicable purposes, as often stated, "a part of it". It was necessary to keep boats and trains moving from day to day, as much so as shovelling coal or greasing engines, etc.

Much might be said about the different theories by supposed experts as to the beneficial effects which flow from levees, but this, I believe, is beside the point since the laborers in the present case were in no manner engaged in those thus defined as "commerce" by the statute, and their work had only a remote bearing, while its main contribution as stated was to flood control.

With respect to producing goods for commerce by the planters, oil operators, sawmills, etc., within the flood protected areas, it is believed that even without the Amendment of 1949, the connection is too remote to justify any such classification of labor upon the main levees on the Mississippi River as falling within its provisions. Certainly, under the Amendment, their work was not "closely related [to the] process(s) and occupation(s)" and was not "directly essential to the production" of such goods as cotton, oil, sugar, lumber, etc.

As to highways, railroads, telephone and telegraph lines as channels of commerce, what has been said above, as to the effects of the labor of defendant's employees upon the river channels, roadbeds, etc., makes this contention even more fanciful and inapplicable, insofar as remoteness is concerned, than what went on in the river. The effect of this contention is to say that by building levees, the lands are protected from overflow, that this permits others wholly unrelated to the levee construction or the river to cultivate lands, raise cotton, rice and sugar cane, produce oil, operate sawmills, etc., which, in turn, warrants the construction of good roads and railroads, with the necessary means of communication, to permit all these varied industries to engage in interstate commerce. It would seem that the work of constructing such improvements and the manufacture of the goods enumerated would be much closer to the actual commerce than the building of the levees in the first instance, which permitted reclamation of the lands.

[2] It must not be overlooked that the Government can, in its own dealings, require contractors, as a condition thereto, to observe the 40-hour week and to pay extra for overtime. What is held in a case like the present should be no different from that which is applicable to private industry. There is no demand for recovery, either by the Government or on behalf of the laborers, of unpaid overtime. As stated earlier, the relief sought is simply an injunction,

mandatory in its nature, to compel the defendant to comply with the Fair Labor Standards Act in keeping records for the future. The only effect would be to set a precedent for the control of relations between employers and employees generally.

The relief should be denied.